**Rose WILDER, Plaintiff–Appellant,**

**v.**

**Kenneth S. APFEL, Commissioner of Social Security, Defendant–Appellee.**

**No. 98–1499.**

United States Court of Appeals, Seventh Circuit.

Submitted Aug. 6, 1998.

Decided Aug. 28, 1998.

Barry A. Schultz, Schultz & Winick, Evanston, IL, for Rose Wilder.

Carole J. Kohn, Social Security Administration, Office of Gen. Counsel, Region V, Chicago, IL, for Kenneth S. Apfel.

Before POSNER, Chief Judge, and BAUER and KANNE, Circuit Judges.

POSNER, Chief Judge.

■ Three years ago almost to the day, we reversed the denial of social security disability benefits to Rosie Wilder, *Wilder v. Chater*, 64 F.3d 335 (7th Cir.1995), holding that the decision of the administrative law judge was unreasonable in light of the record before him. On remand, further evidence was taken, benefits were again denied (by a different administrative law judge), the district court (a different district judge) again affirmed, and we again reverse on the same ground as we did in our original decision. But this time, to bring the charade to an end, we order the Social Security Administration to award Wilder the benefits that she applied for.

Wilder was employed (most recently as a security guard in a retirement home) until 1986, and she claims that in that year, when she was 47 years old, she became permanently and totally disabled by severe depression. There is no doubt that she is today and has been since 1992 totally disabled, but, for a reason explained in our original opinion, she can get nothing unless she was totally disabled before the end of 1986. The only medical evidence that was before the administrative law judge in the first round was the testimony of a psychiatrist selected by the Social Security Administration, a Dr. Adams. He testified that, on the basis of the description of Wilder's condition in 1986 by her daughter (who also testified), Wilder was indeed totally disabled by major depression back then. The administrative law judge thought Adams's testimony outweighed by other "facts": the retirement home would not have allowed Wilder to carry a gun on duty if she had really been mentally ill; the Illinois Department of Child and Family Services would not have let her, had she been mentally ill, adopt her grandson (the mother, Wilder's daughter, was a drug addict); her medical records did not mention mental illness; her daughters believed that her condition had gotten worse in 1988 and 1989, so it must have been better in 1986; and she had won the state lottery shortly before she quit her job in the retirement home, and this rather than mental illness was probably the factor that had precipitated her exit from the labor force.

■ We ruled that these facts (not all of which *were* facts) could not reasonably be thought to outweigh, or even seriously to contradict or qualify, Dr. Adams's disinterested expert testimony. (And remember that he was the agency-appointed expert, not a party expert. Cf. *Saelee v. Chater*, 94 F.3d 520, 522–23 (9th Cir.1996).) There was no evidence from the retirement home; so far as appears, it had no awareness of Wilder's mental condition. There was no evidence from the DCFS either; it may have been unaware of Wilder's condition, careless, or willing to overlook it in light of her having money from her lottery winnings and the mother's being a drug addict; in any event, it had lost Wilder's file. The medical records were of purely physical ailments. Although the first mention in the records of a psychiatric disorder does not appear until 1992 (when she was diagnosed as suffering from major depression), Wilder is an inner-city black woman with a sixth-grade education who, so far as appears, was not advised to seek psychiatric treatment by any of the doctors who saw her for her diabetes and other physical illnesses, or by family and friends, who come from the same deprived milieu. As for the timing of her quitting her job, Adams testified that the winning of the lottery may have been a factor (along with the arrival a few days later of the later-to-be-adopted baby) that precipitated her major depression. There was also evidence that Wilder wasn't actually fit to work; that she worked out of financial desperation; that she could do her job only because one of the residents of the retirement home sat with her all day and her daughters constantly looked in on her at work. As we pointed out in our previous opinion, employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job. 64 F.3d at 337–38; see also *Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir.1998). One can be unemployable (*O'Connor v. Sullivan*, 938 F.2d 70, 72–73 (7th Cir.1991)), yet employed.

At the hearing on remand, another psychiatrist, a Dr. Blackman, testified. He had known and respected Dr. Adams (who had died since the first hearing), but said that he himself could not offer an opinion on whether Wilder had been afflicted with major depression back in 1986, because the evidence presented at the first hearing (he had read the transcript) pointed in both directions. So one of the daughters was called to the stand to give a more particular description of her mother's condition back in 1986. She testified that she had to get her mother's uniform together for her every day because otherwise mother would "grab a pair of pants and maybe a blouse and put it on," forgetting that she had to wear a uniform in her job at the retirement home. Although Wilder had a car and a driver's license and it was only a half mile from home to work, the daughter testified that she had to drive her to and from work because Wilder got lost if she tried to get there and back herself. She no longer cooked, "because she started burning up, burning things up." She did no shopping by herself, though sometimes she accompanied her daughter on shopping trips, and since 1984 this daughter had taken care not only of all the household bills but of all the grandchildren whom Wilder had adopted. As early as 1986 the daughter would only allow Wilder to hold the baby (the first of the adopted children) for a minute or two "because she [that is, Wilder] had a nervous condition. She would shake and stuff like that so I didn't want her to drop the baby." At work, a resident of the retirement home kept Wilder company all the time because Wilder would fall asleep and also had a bladder problem that sent her to the bathroom two or three times an hour.

Blackman was recalled and Wilder's lawyer, summarizing the testimony of the daughter and other testimony that had been given at the original hearing (testimony that Wilder left burning cigarettes around the house, had frequent, unexplained crying jags, wasn't happy about winning the lottery, and that the daughters would remove Wilder's gun when she came home from work, lock it up, and only give it back to her when they drove her to work the next day), asked Blackman whether if all this testimony was true Wilder had been suffering from major

depression and Blackman said yes. The administrative law judge then asked him a hypothetical question that emphasized the absence of documentation of Wilder's mental condition in 1986 and to this he answered that with *that* information he would adjudge her condition not to have been severe. From Blackman's not wholly clear testimony, it appears that he believes that a diagnosis of mental illness requires contemporaneous medical documentation. That is a legal rather than a medical judgment, and happens to be incorrect. What is required is contemporaneous corroboration of the mental illness, *Estok v. Apfel*, 152 F.3d 636, 1998 WL 446211 (7th Cir.1998), not necessarily contemporaneous *medical* corroboration. Soc. Sec. Ruling 83–20 (1983); *Lichter v. Bowen*, 814 F.2d 430, 435 (7th Cir.1987); *Grebenick v. Chater*, 121 F.3d 1193, 1198–99 (8th Cir.1997); *Likes v. Callahan*, 112 F.3d 189 (5th Cir.1997) (per curiam). That would be a peculiarly unreasonable requirement in the case of depression, a notoriously underreported disease. *Nguyen v. Chater*, 100 F.3d 1462, 1465 (9th Cir.1996). A psychologist and a psychiatrist had examined Wilder in 1991 and 1992 respectively and reported that Wilder had been seriously depressed for a long time. The psychiatrist said that Wilder "appears to have a severe major depression that has been going on for many years." Blackman said these reports were accurate but irrelevant because not contemporaneous—again offering gratuitously an erroneous legal opinion unfortunately adopted by the administrative law judge in her opinion.

That opinion is no more reasoned than the first one. It makes no reference to our opinion and it is unclear whether this administrative law judge ever saw it. The pertinent discussion (we will not have to consider the evidence of disability based on Wilder's physical ailments, and hence the testimony of the vocational expert, which related mainly to those ailments) starts off on the wrong foot by stating that Blackman "testified that there is no evidence of claimant having a severe mental impairment prior to December 31, 1986." That is not what he testified. He testified that there was evidence of such an impairment and evidence against and he couldn't decide which body of evidence was

more persuasive. In answering the two hypothetical questions, one based on the evidence favorable to Wilder's claim and the other on the evidence against it, as he did, Blackman was in effect merely repeating that he could not form any opinion. If Blackman's testimony dropped out as hopelessly inconclusive as well as contaminated by legal confusion, this left Adams's testimony, corroborated by the 1991 and 1992 psychologist and psychiatrist reports, to support the claim, as the administrative law judge neglected to observe. Later in the opinion she stated that Dr. Blackman "found that there is insufficient evidence to meet the [criteria for major depression]." This is a reference to his answer to her hypothetical question; she nowhere mentions his equal and opposite answer to the hypothetical question put to him by Wilder's lawyer.

■■■ The opinion states that the retirement home would have been "derelict" in letting Wilder have a gun "if she were unable to function appropriately," that the DCFS would have been "grossly delinquent" to allow her to adopt a child if she "were unable to function mentally," and that "it would be remarkable that claimant's doctors did not refer her to a psychiatrist in 1986, if she had a severe mental impairment at that time." We had discussed all this evidence in our first opinion and explained why it was insufficient. The administrative law judge ignored our discussion. She was not free to do that. The law of the case doctrine, which requires "the trial court to conform any further proceeding on remand to the principles set forth in the appellate opinion unless there is a compelling reason to depart," *Law v. Medco Research, Inc.*, 113 F.3d 781, 783 (7th Cir. 1997), is applicable to judicial review of administrative decisions. *Key v. Sullivan*, 925 F.2d 1056, 1060 (7th Cir.1991); *Chicago & Northwestern Transportation Co. v. United States*, 574 F.2d 926, 929–30 (7th Cir.1978); cf. *Angevine v. Sullivan*, 881 F.2d 519 (7th Cir.1989). It requires the administrative agency, on remand from a court, to conform its further proceedings in the case to the principles set forth in the judicial decision, unless there is a compelling reason to depart.

■■■ A ruling that evidence was insufficient to support some finding is the type of ruling that establishes the law of the case.

*State Industries, Inc. v. Mor–Flo Industries, Inc.*, 948 F.2d 1573, 1577 (Fed.Cir.1991); *United States v. Monsisvais*, 946 F.2d 114, 117–18 (10th Cir.1991); cf. *Fadhl v. City & County of San Francisco*, 804 F.2d 1097, 1099 (9th Cir.1986) (per curiam). New evidence can furnish compelling grounds for departure from a previous ruling. E.g., *Curran v. Ho Sung Kwon*, 153 F.3d 481, 486–87 (7th Cir.1998); *Society of Roman Catholic Church of Diocese of Lafayette, Inc. v. Interstate Fire & Casualty Co.*, 126 F.3d 727, 735–36 (5th Cir.1997); *Wilson v. Meeks*, 98 F.3d 1247, 1250 (10th Cir.1996). But if there is no new evidence, or if, as here, the evidence does not undermine the previous ruling on sufficiency, then that previous ruling must stand. *United States v. Rivera–Martinez*, 931 F.2d 148, 153 (1st Cir.1991); *In re Japanese Electronic Products Antitrust Litigation*, 807 F.2d 44, 48 (3d Cir.1986).

■■■ The Social Security Administration in its brief refers to our analysis of the evidence as "dicta." This reflects a deep misunderstanding of that term. Dicta are the parts of an opinion that are not binding on a subsequent court, whether as a matter of stare decisis or as a matter of law of the case. *Todd v. Societe Bic, S.A.*, 21 F.3d 1402, 1411 (7th Cir.1994) (en banc); *United States v. Crawley*, 837 F.2d 291 (7th Cir. 1988); *In re McGrew*, 120 F.3d 1236, 1238 (Fed.Cir.1997); *In re Meridian Reserve, Inc.*, 87 F.3d 406, 410 (10th Cir.1996); *Coca-Cola Bottling Co. of Shreveport, Inc. v. Coca-Cola Co.*, 988 F.2d 414, 430 (3d Cir.1993). They are nonbinding for two reasons. First, not being integral elements of the analysis underlying the decision—not being grounded in a concrete legal dispute and anchored by the particular facts of that dispute—they may not express the judges' most careful, focused thinking. Second, to give the inessential parts of an opinion the force of law would give judges too much power, and of an essentially legislative character; we could hardly consider ourselves judges in the Anglo-American tradition were we to interrupt this opinion to offer our thoughts, however well considered, on, say, the hearsay rule, or the Americans with Disabilities Act, or the FELA.

But what the SSA describes as "dicta" are the essentials of our first decision, the grounds on which we reversed the denial of benefits. *Creek v. Village of Westhaven*, 144 F.3d 441, 445–46 (7th Cir.1998); *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183–84 (10th Cir.1995). Take them away and there wouldn't be an opinion, just a conclusion. We left the agency free to reinterpret the evidence or to take new evidence, or both. But with regard to the gun, the adoption, and the medical records, all of which we ruled insufficient whether considered separately or together, the administrative law judge received no new evidence except that Wilder "helped" place her drug-addicted daughter in a 30day drug program and that she took a 30–hour course of some sort (contents unknown) before she was allowed to carry a gun. The course must have been before she started working as a guard, and so is irrelevant. We do not know when she "helped" place her daughter in a drug program or what the help consisted of, and so this evidence too is completely useless.

The administrative law judge tendered a bit of evidence of her own: that the tears Wilder shed when she learned that she had won the lottery may have been "tears of joy." No witness suggested that. The administrative law judge added that "claimant was able to shop" and "after winning the lottery, she bought cars and clothes." The only evidence was that Wilder was *not* able to shop alone. True, after she won the lottery there was money for cars and clothes, but so far as appears the selecting of the things to buy was done by members of her family, not by her. The administrative law judge's opinion states that "claimant maintained a full range of activities of daily living during the relevant time period." The undisputed evidence is to the contrary. The only activities she engaged in, besides snoozing at the guard's desk in the retirement home and going to the bathroom, were smoking and watching television. The fact that the evidence concerning the range of her activities was uncontradicted did not require the administrative law judge to believe it. She might have thought it a tissue of lies. But the only testimony bearing on Wilder's mental condition that the administrative law judge expressed skepticism about was the shaking. The opinion states that the daughter testified "that her mother would shake, and therefore she did not hold the baby. However, the undersigned notes that, during the entire hearing, claimant never shook." The fact that 12 years later Wilder doesn't shake in a hearing room could not reasonably be thought to invalidate the daughter's testimony. The administrative law judge also ignored Wilder's testimony that she had taken medication (unidentified) before coming to the hearing, which might have arrested the shaking. She did cry at both hearings.

The only new evidence bearing on the issue of Wilder's mental condition in 1986, besides the testimony of the daughter amplifying her previous testimony and strengthening the case for Wilder, was Blackman's evidence. And his evidence was a wash. It left the case exactly where it was the last time: with no reasoned basis for the denial of benefits.

■ Given the obduracy evidenced by the action of the administrative agency on remand, we remand the case to the agency with directions that the application for benefits be granted. *Micus v. Bowen*, 979 F.2d 602, 609 (7th Cir.1992); see *Hatcher v. Secretary, Dept. of Health & Human Services*, 898 F.2d 21 (4th Cir.1989); *Woody v. Secretary of Health & Human Services*, 859 F.2d 1156, 1162–63 (3d Cir.1988); *Carroll v. Secretary of Health & Human Services*, 705 F.2d 638, 644 (2d Cir.1983).

REVERSED AND REMANDED, WITH DIRECTIONS.